UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**John Stagikas**

      Plaintiff

v.

**Saxon Mortgage Services, Inc.**

      Defendant

Civ. A. No. 10-40164-TSH

**Plaintiff's Opposition to Defendant's Motion for Summary Judgment**

## I. Introduction

It is undisputed that Saxon offered Stagikas a trial loan modification under the HAMP program, and that both Saxon and Stagikas signed it. The trial modification promised to provide Stagikas with a permanent loan modification so long as he made the required payments, which he did. Although Saxon claims that no modification was required because of the result of the Net Present Value test, the guidelines for the test—and Saxon's own documents which it reluctantly produced after an order compelling thet—showed Stagikas was eligible for a modification. Saxon's failure to provide the modification, and its misrepresentations related to the trial modification, constitute a breach of contract and a violation of Mass. Gen. Laws ch. 93A. Furthermore, Saxon contacted Stagikas at least 16 times after being notified that he was represented by counsel, in violation of the Fair Debt Collection Practices Act. As a result, Stagikas suffered damages including loss of the benefits of a modified loan, invasion of his rights under ch. 93A, emotional distress, and physical symptoms compensable under the FDCPA. Saxon's motion for summary judgment should be denied.

## II. Facts

**A.      Background on Saxon's participation in HAMP.**

In March 2009, the federal government established the Home Affordable Modification Program ("HAMP"). (Pl's SMF ¶ 1, Culik Decl. Ex. 4, Freddie Mac Bulletin 2009-6, p. 1.) The goal of the HAMP is to help troubled borrowers who, due to hardship, have either defaulted on their mortgages or are at imminent risk of default. The modifications help stabilize neighborhoods and communities that are being severely impacted by declining home values and an increasing number of foreclosures. (Pl's SMF ¶ 2, Culik Decl. Ex. 4, Freddie Mac Bulletin 2009-6, p. 1.) *See Speleos v. BAC Home Loans Servicing, L.P.*, 755 F. Supp. 2d 304, 309 (D. Mass. 2010) ("the purpose of HAMP is to help homeowners avoid foreclosure by obtaining loan modification[s]."). These loan modifications are accomplished by a combination of steps that reduce a borrower's monthly mortgage payment to 31% of his or her income. (Pl's SMF ¶ 3, Culik Decl. Ex. 4, Freddie Mac Bulletin 2009-6, p. 1.)

Defendant Saxon Mortgage Services, Inc. ("Saxon") participates in HAMP. In exchange for its participation in HAMP, the federal government will pay Saxon more than $503 million. (Pl's SMF ¶ 4, Culik Decl., Ex. 4, Saxon Servicer Participation Agreement, § 4.F, p. 4.) Saxon's agreement with the federal government states that that Saxon "shall" perform loan modifications under HAMP for all eligible mortgages:

> Servicer *shall* perform the Services [HAMP] for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor").

*Id.* (emphasis added).The guidelines for Saxon's participation in HAMP are set by Freddie Mac. (Pl's SMF ¶ 5, Freddie Mac Single-Family Seller/Servicer Guide).

The procedure for applying for and being provided with a loan modification is as follows. First, the borrower sends in an application containing the relevant financial information showing income and expenses. (Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-11.) The servicer then evaluates the homeowner's information to determine eligibility for a three-month trial loan modification ("TPP"), and sends the borrower a trial modification if eligible. The TPP is a form contract produced by Freddie Mac and provided to the servicer. (Pl's SMF ¶ 9, Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-30.) The amount of the monthly payment is based on 31% of the borrower's gross monthly income. If the borrower makes the TPP payments, the servicer must provide the borrower with a permanent loan modification with payments in the same amount as the TPP. (Pl's SMF ¶ 10, Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-25.)

The servicer also runs a test, called the Net Present Value ("NPV") test, to determine whether a modification is in the servicer's interest. If the NPV test result is negative, a servicer is not required by HAMP guidelines to provide a permanent loan modification *only if* two conditions are met: (1) the Mark-to-Market LTV [loan-to-value] ratio is less than 100%, and (2) principal is being forbeared. (Pl's Resp. to Def's SMF ¶ 13; Pl's SMF ¶ 11, Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-13.)

It has been widely reported that Saxon failed to comply with HAMP guidelines in many instances. *See, e.g.,* Neil Barofsky, *Bailout: How Washington Abandoned Main Street While Rescuing Wall Street* 155 (1st ed. 2013) (former Special Inspector General of the Troubled Asset Relief Program explaining how Saxon failed to provide homeowner with permanent loan modification).

**B.    Saxon offered Stagikas a trial modification, but refused to provide him with a permanent modification, and contacted him directly despite knowing he was represented.**

Plaintiff John Stagikas ("Stagikas") resides in Sturbridge, Massachusetts. (Pl's SMF ¶ 12.) He refinanced the mortgage on his residence in 2006 with a loan in the amount of $334,500. (Pl's SMF ¶ 12, Stagikas Aff. ¶ 9.) His monthly mortgage payment of principal, interest, taxes, and insurance was approximately $2,515. (Pl's SMF ¶ 12.) After a loss of his primary source of income, Stagikas contacted his mortgage servicer, Taylor Bean & Whitaker ("TB&W") to find out about what options were available to him to help him avoid foreclosure. (Pl's SMF ¶ 13, Stagikas Aff. ¶ 5.) A representative from TB&W advised him to cease making mortgage payments, and said that TB&W would then consider Stagikas for a loan modification. Stagikas thus did as instructed and fell behind on his mortgage payments. (Pl's SMF ¶¶ 12-13, Stagikas Aff. ¶ 5.) Servicing of Stagikas's mortgage was then transferred from TB&W to Saxon in or around August 2009. (Pl's SMF ¶ 14–15, Stagikas Aff. ¶ 6.)

Stagikas submitted a loan-modification application to Saxon in or around September 2009, providing all required financial information. (Pl's SMF ¶ 17, Stagikas Aff. ¶ 7.) In response, Stagikas received an offer from Saxon in late September 2009 of a trial loan modification ("TPP"). (Pl's SMF ¶ 18, Stagikas Aff. ¶ 8 and Ex. 1.) The TPP promised Stagikas a permanent modification so long as he complied with the terms of the TPP by making three payments, in October, November, and December 2009. *Id.* On the phone with Saxon, a representative promised Stagikas that he had already been approved for a permanent modification and all he needed to do was make his trial payments, and then he would be provided with the permanent modification. (Pl's SMF ¶ 18, Def's Mot. for Summ. Judg. Ex. B, Depo. of Stagikas at 44:10–45:7.)

Stagikas signed and returned the TPP. In turn, Saxon representative Annette Stagikas counter-signed the TPP and returned a copy to him. (Pl's SMF ¶ 19, Stagikas Aff. ¶ 8, Culik Decl. Ex. 1, Def's Answs. to Pl's Interrog. No. 5.) Stagikas then made his three trial payments. (Pl's SMF ¶ 19, Stagikas Aff. ¶¶ 11–12.)When Saxon failed to provide the permanent modification, Stagikas even made two additional payments in January and February 2010. Finally, when Stagikas attempted to make a payment in March 2010, a Saxon representative told Stagikas that Saxon would not be providing him with a permanent modification. (Pl's SMF ¶ 19, Stagikas Aff. ¶¶ 11–12.)

Stagikas then received two conflicting letters from Saxon related to the reason for its not providing a permanent modification. First, on April 8, 2010, Saxon informed Stagikas that he was denied due to negative NPV results. (Pl's SMF ¶ 20, Stagikas Aff. Ex. 2.) Then, on April 10, 2010, Saxon informed Stagikas that he had been denied because he did not provide documents Saxon requested. (Pl's SMF ¶ 21, Stagikas Aff. Ex. 3.) Both of these explanations confused Stagikas—Saxon made no mention of a NPV test in the TPP, and he had submitted all documents Saxon requested of him. (Pl's SMF ¶ 22, Stagikas Aff. ¶ 15.)

Stagikas thus engaged counsel to assist him with this issue. Saxon's first letter, regarding the NPV, said that Stagikas could request the data used to perform the NPV test. So, Stagikas instructed his attorney to request the same, and sent a letter on May 17, 2010. The letter also contained a notification that Stagikas was represented by counsel. Saxon, however, refused or failed to respond. (Pl's SMF ¶¶ 23–24, Stagikas Aff. ¶ 17.) Stagikas then instructed his attorney to send a demand letter to Saxon pursuant to Mass. Gen. Laws ch. 93A ("ch. 93A") related to Saxon's failure to provide the NPV data, and its failure to provide the permanent loan modification. Saxon again refused or failed to respond. (Pl's SMF ¶¶ 25–26, Stagikas Aff. ¶ 19, Ex. 5.) Saxon also continued to contact Stagikas directly, sending at least 16 letters directly to him

even after being notified that Stagikas was represented by counsel. (Pl's SMF ¶ 27, Stagikas Aff. Exs. 6, 8.)

Stagikas has suffered damages as a result of Saxon's actions. He had his right to be contacted through counsel violated; he lost the benefit of the loan modification; he lost weight, which affected his performance in his career as a professional wrestler; he lost employment as a bartender due to the distractions of repeatedly sending letters to, and contacting, Saxon; he suffered emotional distress including racing heart, restlessness, muscle tension; and he developed shingles that he attributes to the stress of dealing with the constant threat of losing his home. (Pl's SMF ¶ 28, Stagikas Aff. ¶¶ 23–24.)

### III. Standard for Summary Judgment Under Rule 56

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Johnson v. Gordon*, 409 F.3d 12, 16–17 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A court should ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986). A court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is not appropriate if, after viewing the record in this light, the court determines that a genuine issue exists and that the moving party is not entitled to judgment as a matter of law.

## IV. Argument

### A. Breach of contract (Count II): Saxon breached its agreement under the TPP to provide Stagikas with a permanent loan modification.

Saxon argues that there was no binding contract, and that even if there was, the TPP did not require Saxon to provide Stagikas with a permanent loan modification. As shown below, however, and as agreed by the as the overwhelming majority of cases in this District, the TPP is a contract. *See Durmic v. J.P. Morgan Chase Bank, N.A.*, 10-CV-10380-RGS, 2010 WL 4825632 (D. Mass. Nov. 24, 2010); *Bosque v. Wells Fargo Bank N.A.*, 762 F. Supp. 2d 342 (D. Mass. 2011); *Belyea v. Litton Loan Servicing, LLP*, No. 10-10931-DJC, 2011 WL 2884964 (D. Mass. July 15, 2011); *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 2011 WL 2637222 (D. Mass. July 6, 2011); *Stagikas v. Saxon Mortg. Servs., Inc.*, 795 F. Supp. 2d 129 (D. Mass. 2011); *Calfee v. CitiMortgage, Inc.*, No 1:10-cv-12051-WGY, Docket #23 (D. Mass. Mar. 12, 2011). Moreover, by signing the TPP and returning it to Stagikas, Saxon obligated itself to provide a permanent modification to him.

### 1) The TPP, signed by both Stagikas and Saxon, was a contract for a permanent modification.

To show breach of contract under Massachusetts law, a plaintiff must demonstrate that the parties had a contract supported by valid consideration that the defendant breached, causing damage to the plaintiff. *City of Revere v. Boston/Logan Airport Associates, LLC*, 443 F. Supp. 2d

121, 126 (D. Mass. 2006). Here, despite Saxon's protestations, the facts show that all the elements of a contract are satisfied by the TPP.

Courts in the District of Massachusetts have determined that a TPP is a contract, as it "has the appearances of a contract." *Durmic*, 2010 WL 4825632, at *1; *Bosque*, 762 F. Supp. 2d at 348 (quoting *Durmic*). As Judge Stearns noted in *Durmic*, the TPP "characterizes itself as an agreement, contains signature lines for the Lender and the Borrower and includes distinctly contractual phrases such as 'under seal' and 'time is of the essence.'" 2010 WL 4825632 at *1, n. 4. Stagikas's TPP contained all these elements, and, moreover, was counter-signed by Saxon.

Stagikas furnished consideration far more than just making modified mortgage payments, although "even a peppercorn" may be sufficient consideration for a contract. *Barry v. Goodrich*, 98 Mass. 335, 338 (1867). The TPP stated that Stagikas had to provide financial documentation make promises about his financial hardship. Specifically, the TPP stated that Stagikas affirmed he (1) could not afford his mortgage payments; (2) lives in the property; (3) the property was not condemned; (4) he had provided documentation of all his income; and (5) he would obtain credit counseling if asked to do so. (Pl's SMF ¶ 18, Stagikas Aff. ¶ 9 and Ex. 1, TPP, ¶ 1(A)–(F).) As this Court already observed, all these detriments constitute consideration. *Stagikas*, 795 F. Supp. 2d at 136. *See also In re Bank of Am. Litig.*, 2011 WL 2637222, at *4 ("The requirements of the TPP all constitute new legal detriments.").

The TPP, first page, second paragraph, last sentence, states that "This Plan will not take effect unless and until both I and the Lender sign it and the Lender provides me with a copy of this Plan with the Lender's signature." (Pl's SMF ¶ 18, Stagikas Aff. Ex. 1.) Stagikas himself signed and returned the TPP to Saxon on September 25, 2009. (Pl's SMF ¶ 19, Stagikas Aff. ¶¶ 11–12.) Saxon, in turn, by a representative named Annette Barron, signed a copy of the TPP and

returned it to Stagikas. (Pl's Resp. to Def's SMF ¶ 9, Culik Decl. Ex. 1, Def's Answs. to Pl's Interrog. No. 5.) The parties thus formed a contract.

> **2)  Any ambiguous terms in the TPP should be construed in Stagikas's favor, making him entitled to a permanent loan modification.**

There are provisions of the TPP that, superficially, conflict with each other. Two paragraphs of the TPP promise Stagikas a permanent modification so long as he complies with the TPP. The first paragraph of the TPP states:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

(Pl's SMF ¶ 18, Stagikas Aff. Ex. 1.) Paragraph 3 of the TPP re-states the same agreement:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

(Pl's SMF ¶ 18, Stagikas Aff. Ex. 1.)  One other paragraph of the TPP, however, states that the agreement will terminate if, among other things, Saxon does not provide Stagikas with a permanent modification. This paragraph, 2.F, states:

> If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement, (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this plan will terminate.

*Id.* Saxon solely relies on this paragraph, and does not address the first two paragraphs in its memorandum. Saxon interprets this paragraph to allow Saxon to fail to provide a permanent modification regardless of whether a homeowner qualifies for the modification.

Saxon's interpretation, however, goes against the canon of construction that form contracts are to be construed strictly against the party on whose behalf they have been drafted. *Lechmere Tire & Sales, Co. v. Burwick*, 360 Mass. 718 (1972). The TPP itself is a form contract produced by Freddie Mac. (Pl's SMF ¶ 9, Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-30.) The contract is used by mortgage servicers like Saxon to provide to eligible homeowners such like Stagikas.

Here, the first paragraph and paragraph 3 require Saxon to provide a permanent loan modification so long as Stagikas complies with the TPP. The awkwardly drafted paragraph 2.F, which Saxon cites, appears to allow Saxon to not provide a permanent loan modification in the event that Saxon does not comply with the requirement to provide a permanent loan modification. This conflicts with the prior two paragraphs. This conflict should be resolved by construing the conflicting provisions in Stagikas's favor, and requiring Saxon to provide Stagikas with a permanent modification. *See Chase Commercial Corp. v. Owen*, 32 Mass. App. Ct. 248, 253, 588 N.E.2d 705, 708 (1992) ("When construction of such an agreement is in issue, it is to be construed strictly against the drafter.").

Saxon cites *Brady v. Chase Home Fin., LLC*, No. 11-CV-838, 2012 WL 1900606 (W.D. Mich. May 24, 2012) in support of its conclusion. *Brady*, however, actually supports Stagikas's position because that court held that when a bank counter-signs a TPP, the bank obligates itself to provide a permanent modification. *Id.* at *7. "By providing an executed copy to the borrower, the lender extends an offer and must provide a modification if the borrower complies with her obligations." *Id.* In that case, however, there was no counter-signed TPP. In Stagikas's case, however, Saxon did counter-sign the modification. Thus, under the holding of Saxon's own cited case law, Stagikas is entitled to a permanent loan modification.

Saxon's argument on this issue was similarly rejected in *Gaudin v. Saxon Mortg. Servs.,*
*Inc.*, No. C 11-1663 RS, 2011 WL 5825144, at *2 (N.D. Cal. Nov. 17, 2011). In that case, denying
Saxon's motion to dismiss, the court held that the TPP required Saxon to provide a permanent
loan modification after Saxon had retuned a signed copy of the TPP to the Borrower. "The flaw
in Saxon's argument is that express language of the TPP simply does not include any such
limitation or condition. To the contrary, the TPP indicates that while it may initially be presented
to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of
it to the borrower . . . then the borrower's eligibility for permanent modification has been
determined, and the only remaining contingencies are those listed specifically in the TPP and
summarized above." *Id.*[1]

Thus, because "any doubts about the interpretation of the [contract] must be resolved in
the plaintiff's favor," *Cormier v. C. Mass. Chapter of Natl. Safety Council*, 416 Mass. 286, 288, 620
N.E.2d 784, 786 (1993), the conflicting TPP provisions should be resolved in Stagikas's favor and
Saxon's motion for summary judgment should be denied.

### 3) Saxon cannot force a breach based on its own bad-faith withholding of Stagikas's permanent modification.

Saxon advances the argument that it did not breach the TPP because it did not provide
Stagikas with a permanent loan modification agreement. *See* Def's Mot. for Summ. Judg., p. 21.
That is, even though Saxon promised to provide Stagikas with a permanent loan modification
agreement in the TPP, Saxon relies on a conflicting provision of the TPP stating that the loan
would not be permanently modified until Saxon provided a permanent modification. Saxon's

---

[1] The recent decision in *Cave v. Saxon Mortg. Servs., Inc.*, No. 12-5366, 2013 WL 1915660, Slip
Copy (E.D. Pa. May 9, 2013) holds the same, i.e., that "the servicer's return of an executed TPP
to the borrower is a communication that the borrower is, in fact, qualified.") (citing *Wigod v.*
*Wells Fargo Bank, N.A.*, 673 F.3d 547, 562 (7th Cir. 2012)).

argument, however, goes against the longstanding contract principle that a promisor may not avoid his own performance based on the nonoccurrence of a condition, if the promisor himself hindered or prevented that condition's occurrence. *Lobosco v. Donovan*, 30 Mass. App. Ct. 53, 565 N.E.2d 819 (1991). Saxon may not withhold the promised performance of providing a permanent modification, and then argue that its own non-performance allows it to deny Stagikas the benefit of the bargain. *See Thomas v. Mass. Bay Transp. Auth.*, 39 Mass. App. Ct. 537, 544, 660 N.E.2d 665, 669 (1995) ("A party may not force a breach of contract by withholding the means of performance.").

The Restatement (Second) of Contracts, § 245, states the principle that "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." This principle has been adopted by Massachusetts. *See Thomas v. Mass. Bay Transp. Auth.*, 39 Mass. App. Ct. 537, 545, 660 N.E.2d 665, 670 (1995). In *Thomas*, the guardian of a passenger who was seriously injured in a bus accident sued the transportation authority for breach of contract after the authority withdrew its settlement offer. The court ruled that the guardian's prior indication of unconditional acceptance of the transportation authority's offer by the deadline date was all that was required to bind the settlement, even though the guardian had not signed the agreement yet. The transportation authority controlled the settlement paperwork and had not yet sent it to the guardian to sign, a fact that was not within the guardian's control. Reversing and remanding the trial court's decision in favor of the transportation authority, the court held that "in contract formation, if one party has put forth an offer for a certain time period, that same party may not prevent acceptance of the offer by denying the means (e.g., the documents) of acceptance if it controls those means." *Id.*

12

In this case, like in *Thomas*, where Saxon controls whether the permanent loan modification agreement is provided to Stagikas, and Stagikas has already indicated his acceptance of a permanent modification agreement under the TPP, Saxon cannot withhold the modification and then claim that Stagikas has breached any obligation or that he is not entitled to the modification. *Id.* Saxon's interpretation "conflicts with the clear tenor of the remainder of the document and would render the other apparent promises in the document illusory." *Cave v. Saxon*, 2013 WL 1915660, at \*7 (quotations omitted).

### 4)  Stagikas qualified for a permanent modification based on Saxon's own NPV guidelines.

Nowhere in the TPP was there any mention of an NPV test, or whether Stagikas would have to pass one in order to qualify for the modification. His only requirement was to make the three TPP payments, and then he was to be provided with a permanent modification. There is no ambiguity on this point, and there was no contingency in the TPP based on whether Stagikas passed the NPV test. Where a contract is *not* ambiguous, "[t]he old-fashioned and still common answer is that extrinsic evidence may be considered if language is ambiguous but *not otherwise* (and whether language is ambiguous is a question for the judge)." *Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 20 (1st Cir. 2004) (emphasis added). Thus, for Saxon to assert that Stagikas is ineligible for a modification because he did not pass the NPV test is irrelevant to whether Saxon breached the contract, as the contract did not contemplate an NPV test, which is an extrinsic factor not bargained-for by the parties.. Simply by failing to comply with the TPP and provide a permanent modification, Saxon breached the agreement.

**5)  Stagikas was eligible for a modification under the NPV test.**

Saxon gave Stagikas two conflicting reasons for denying him for a permanent loan modification. (Pl's SMF ¶¶ 20–21, Stagikas Aff. Exs. 2–3.) One of these reasons is that the NPV test, which measures the benefit of the loan modification to the lender, was allegedly negative. (Pl's SMF ¶ 20, Stagikas Aff. Ex. 2.) Under the guidelines for HAMP, however, even if the NPV test was negative, Saxon was required to provide Stagikas with a modification, explained below.

HAMP guidelines require modification if the NPV test is negative in only certain circumstances. Freddie Mac Bulletin 2009-10 states that Saxon *must* modify Stagikas's mortgage, *even if the NPV test is negative*, so long as two factors do not coexist: (1) the Mark-to-Market LTV Ratio is not less than 100%, and (2) no principal is being forbeared.

> ■ **If the result of the NPV test is negative**, **the Servicer must modify the Mortgage, unless the Mark-to-Market LTV Ratio is less than 100% and principal is being forbeared**. If principal forbearance is needed to achieve a Target Payment and the resulting Mark-to-Market LTV Ratio would fall below 100%, then the Borrower is not eligible for a modification under this Program, except as set forth in Section C65.7I, and the Servicer should review the Borrower for other foreclosure alternatives.

(Pl's Resp. to Def's SMF ¶ 13, Culik Decl. Ex. 5, Freddie Mac Bulletin 2009-10, p. C65-13) (emphasis added).

Here, the data Saxon produced in its production of documents after the Court allowed Stagikas's motion to compel shows Stagikas's Mark-to Market LTV was *not* less than 100%; rather, it was 103.30%. (Pl's Resp. to Def's SMF ¶ 13, Culik Decl. Ex. 8, Saxon Supp. Docs., STAG000763.) Thus, the first of the two factors does not exist, and, as the above Freddie Mac guide states, "the Servicer must modify the Mortgage." Furthermore, the documents Saxon produced state that the investor and the NPV results qualified Stagikas for a "Standard HAMP" modification. *Id.* at STAG000764. This also shows that Stagikas qualified for a HAMP modification based on Saxon's internal calculations.

Saxon does not mention either of the above two facts in its memorandum. Instead, Saxon asserts that "Plaintiff may calculate his own NPV calculation" by going the website www.CheckMyNPV.com. *See* Def's Mot. for Summ. Judgment, p. 6, fn. 2. This is false for two reasons. First, the CheckMyNPV website that Saxon references did not come into existence until over a year *after* Saxon denied Stagikas for a modification. *See* HMPAdmin.com, "CheckMyNPV.com Launched Today" (press release announcing introduction of checkmynpv.com on May 23, 2011).[2] And second, when the NPV data points are entered into the CheckMyNPV website, it does *not* state that his loan is NPV negative, and instead shows that Stagikas "may be eligible for a HAMP modification." (Pl's Resp. to Def's SMF ¶ 13, Culik Decl., Ex. 6, CheckMyNPV.com Results.) Saxon's assertion that Stagikas did not qualify for the modification under the NPV test is baseless.

Thus, Saxon has not provided any substantiation for its bare assertion that Stagikas did not qualify for HAMP, and even if it had, Stagikas has presented facts contradicting Saxon's assertion, making this an issue of fact for the jury. Summary judgment should be denied on this count.

**B.      Chapter 93A (Count I): Saxon's actions were unfair and deceptive.**

Chapter 93A of the Massachusetts General Laws provides a private cause of action for "any person . . . who has been injured by another person's use or employment of" an unfair or deceptive act or practice. Mass. Gen. Laws ch. 93A, § 9. Chapter 93A "was intended to be far more than a pale reflection of existing statutory and common law rights." *Massachusetts v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5975053, (Mass. Super. Nov. 10, 2008), *aff'd* No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009). "[A]nalogies between common law

---

[2] Available at https://www.hmpadmin.com/portal/news/docs/2011/hampupdate052311.pdf.

claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many essential elements of those common law claims." *Nei v. Burley*, 388 Mass. 307, 313, 446 N.E.2d 674, 678 (1983). *See also Patricia Kennedy & Co. v. Zam-Cul Enters., Inc.*, 830 F. Supp. 53, 59 (D. Mass. 1993) (Massachusetts law does not require that plaintiffs prove a separate, independent cause of action to satisfy a claim under ch. 93A).

When determining whether a practice is "unfair" under ch. 93A, a court should consider three factors. These are: (1) "whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness"; (2) "whether it is immoral, unethical, oppressive, or unscrupulous"; and (3) "whether it causes substantial injury to consumers." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596, 321 N.E.2d 915, 918 (1975) (quoting 29 Fed. Reg. 8325, 8355 (1964)). In the First Circuit, at least one of the above criteria, although not necessarily all, must be met by the practice under question. *Gerli v. G.K. Hall & Co.*, 851 F.2d 452, 454 (1st Cir. 1988). In Stagikas's case, all three criteria are clearly met.

A violation of HAMP that is unfair or deceptive violates ch. 93A. *See Morris v. BAC Home Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 262 (D. Mass. 2011) ("the Treasury Department also knew that servicers were bound by state consumer protection laws, and the liability created thereunder. Regardless, given the limited nature of Freddie Mac's actual enforcement power, there is nothing about recovery under Chapter 93A that actively conflicts with the enforcement scheme in the HAMP guidelines."). In the context of ch. 93A, "[a]pplying these factors to the HAMP context, the regulatory requirements of HAMP form the statutory 'penumbra', a dereliction of duty under the HAMP contract is colorably unethical or unscrupulous (especially in light of the applicant's reasonable expectations), and there is potential substantial injury to an applicant facing foreclosure and/or substantial arrearages." *Id.* at 263.

There is a "growing chorus of cases in this district" holding that a bank's failure to provide a permanent modification after a TPP is a violation of ch. 93A. *Belyea*, No. 10-10931-DJC, 2011 WL 2884964, at *10–5; *In re Bank of Am. (HAMP) Litig.*, 2011 WL 2637222; *Stagikas v. Saxon Mortg. Servs., Inc.*, 795 F. Supp. 2d 129; *Calfee,* No 1:10-cv-12051-WGY, Docket #23..

Here, Saxon's conduct meets all three factors of the test for unfairness. It meets the first factor because the TPP is within the "penumbra" of an established regulatory scheme for providing homeowners with loan modifications under HAMP, as explained in the statement of facts, *supra*. Saxon's conduct meets the second factor because its actions were unethical and unscrupulous. That is, Saxon not only promised in the TPP to provide a permanent modification, but Saxon also assured Stagikas in a subsequent telephone conversation that he would be provided with the modification, but was never given one.

> Q. What else was your understanding of what they [Saxon] were required to do under the contract?
>
> A. Well, over the phone the representative told me that there's no reason that you're not going to get modified. Your financials look good. Make your three trial payments. As long as all your paperwork is in, you will get modified.
>
> Q. He said there's no reason that you wouldn't get modified?
>
> A. Right.

(Pl's SMF ¶ 18, citing Def's Mot. for Summ. Judg., Ex. B, Depo. of Stagikas at 44:10–45:7.)

Saxon then gave what appear to be deceptive and conflicting reasons for denying Stagikas for the modification, stating within a matter of two days that Stagikas was denied due to negative NPV, and then that he was denied due to a failure to provide documents. (Pl's SMF ¶¶ 20–21, Stagikas Aff. Exs. 2–3.) As explained above in Section IV.A.4, Stagikas's loan did not the type of negative NPV that would prohibit modification. Moreover, Stagikas had complied with Saxon's requests for documents. (Pl's SMF ¶ 17, Stagikas Aff. ¶ 7.) Saxon's actions were deceptive and unethical, and show that its violation of ch. 93A was not merely predicated on a breach of

contract, but was part of a wider pattern of unfair actions directed at Stagikas. *See Okoye v. Bank of N.Y. Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *11 (D. Mass. July 28, 2011) (denying motion to dismiss where "it was in the process of those [loan modification] negotiations that [the bank] acted deceptively and unfairly by withholding and changing information, providing pretextual reasons for denying modification, and making misleading statements regarding the process and the state of the loan."). The facts in this case similarly show that Saxon's denial of Stagikas's loan modification was pretextual, and that that Stagikas was entitled to a modification.

As to the third factor, foreclosures cause "substantial injury" to consumers. The foreclosure rate in 2010, at the time Stagikas was denied for the modification, was more than three times what it was in 1933, at the height of the Great Depression.[3] The crisis has impacted every part of our country and most of the world. As the chairman of the Federal Reserve Board has noted, the crisis threatens our national economy.[4]

In its attempt to understate the unfairness of its actions, Saxon uses the heightened standard for unfairness in *business-to-business* conflicts under ch. 93A, § 11, rather than for *consumer-to-business* conflicts, incorrectly citing to *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 39 (1st Cir. 2000) for the conclusion that a business's conduct must rise to the level of "commercial extortion" to violate ch. 93A. *See* Def's Mot. to Dismiss, p. 8. This standard only applies to disputes between businesses, not disputes between a consumer and a business, as is the case here. *See L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147,

---

[3] The U.S. foreclosure rate (percentage of outstanding mortgage loans in foreclosure) at the end of the second quarter of 2010 was 4.57%. Mortgage Banker's Ass'n, *National Delinquency Survey Q2 2010*, at 3. The foreclosure rate for non-farm mortgages peaked in 1933, below 1.4%. David C. Wheelock, *The Federal Response to Home Mortgage Distress: Lessons from the Great Depression*, 90 Federal Reserve Bank of St. Louis Rev. 133, 138–39 (2008).

[4] Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, Speech at the Federal Reserve System Conference, *Housing and Mortgage Markets: Housing, Mortgage Markets, and Foreclosures* (Dec. 4, 2008) available http://www.federalreserve.gov/newsevents/speech/bernanke20081204a.htm.

154 (D. Mass. 2000) ("This was an arms-length transaction between businesses, not a deal between a worldly-wise business and a commercial innocent.").

Finally, even if some technicality caused the Court to dismiss the breach of contract claim (which it should not), Stagikas's ch. 93A claim is not dependent on the viability of the contract, because Stagikas has shown Saxon's conduct to be unfair and deceptive. *See NASCO v. Pub. Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997) (under basic ch. 93A law "[a] party is not exonerated from Chapter 93A liability [simply] because there has been no breach of contract."). The Court should thus deny Saxon's motion for summary judgment on this claim.

**C.    FDCPA (Count III): Saxon violated the FDCPA by contacting Stagikas when he was represented by counsel, and by engaging in unfair and deceptive acts.**

**1)  Saxon's actions are subject to the FDCPA.**

The Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et al.* ("FDCPA") was enacted to prevent abusive, deceptive, and unfair debt collection practices by debt collectors. *Id.* To that end, the FDCPA prohibits debt collectors from committing the acts Saxon committed in this case, i.e., communicating directly with consumers who are represented by counsel, 15 U.S.C. § 1692c(a)(2), and using "unfair and unconscionable" means to collect debts. 15 U.S.C. § 1692f. The FDCPA is a remedial statute to be broadly construed so as to affect its purpose. *Brown v. Card Serv. Ctr.,* 464 F.3d 450 (3d Cir. 2006). The FDCPA imposes strict liability on debt collectors for their violations a plaintiff "need only show a violation of one of the FDCPA's provisions to make out a prima facie case." *Stagikas*, 795 F. Supp. 2d at 138 (quoting *Harrington v. CACV of Colo., LLC*, 508 F. Supp. 2d 128, 132 (D. Mass. 2007)).

Here, the mortgage is a "debt" and Saxon is a "debt collector" pursuant to 15 U.S.C. § 1692a(5) and (6), respectively. The mortgage is a debt because it was for a loan on Stagikas's principal residence. (Pl's SMF ¶ 12, Stagikas Aff. ¶ 3.) *See Bush v. Loanstar Mortgage Serv.,*

*L.L.C.*, 286 F. Supp. 2d 1210 (N.D. Cal. 2003) (a loan to purchase one's residence is a debt covered by the FDCPA). Saxon is a debt collector because the mortgage was in default when servicing of the loan was transferred from the prior servicer, TB&W, to Saxon. (Pl's SMF ¶¶ 13–14, Stagikas Aff. ¶ 5.) *See Dolan v. Fairbanks Capital Corp.*, 2008 WL 4515932 (E.D.N.Y. Sept. 30, 2008) (allegation that mortgage servicer acquired loan after default brought servicer within the FDCPA). Thus, Saxon's actions are subject to the FDCPA.

### 2) The letters Saxon sent to Stagikas were "communications" subject to the FDCPA.

The FDCPA prohibits debt collectors from communicating with consumers who are represented by an attorney. This prohibition is stated as follows:

> [A] debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer.

15 U.S.C. § 1692c. A "communication" is defined as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). That is, any transmission of information regarding a debt. In evaluating whether a communication violates the FDCPA, courts utilize the so-called "least sophisticated debtor" standard. *In re Maxwell*, 281 B.R. 101, 118 (Bankr. D. Mass. 2002) (citing *Taylor v. Perrin, Landry, de Launay & Durand*, 103 F.3d 1232, 1236 (5th Cir. 1997)).

Saxon reads the term "communication" narrowly, arguing that a communication for purposes of the FDCPA is only a demand for payment or an assertion that an amount is owed. *See* Def's Mot. to Dismiss, p. 23. In support of this argument, Saxon cites an unpublished opinion from Michigan, *Francis v. GMAC Mortg.*, No. 06-CV-15777-DT, 2007 WL 1648884 (E.D. Mich.

June 6, 2007), in which the trial court held that notices sent by a debt collector were not communications under the FDCPA because they did not expressly demand payment. *Id.* at *4. The weight of authority, however, is against Saxon's position. Circuit court decisions from the Seventh and Third Circuits hold that communications from a debt collector that convey information related to the debt are communications subject to the FDCPA.

In *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380 (7th Cir. 2010), a homeowner filed suit against her mortgage servicer under the FDCPA after the servicer sent letters soliciting her to provide financial information in connection with applying for a loan modification, despite knowing her to be represented by an attorney. The court noted that besides the loan-modification solicitations, the letters also contained the warning "THIS LETTER IS AN ATTEMPT TO COLLECT YOUR DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." *Id.* at 382–83. The servicer filed a motion to dismiss, contending that the communications were not made "in connection with the collection of" the plaintiff's debt. *Id.* at 383. The trial court dismissed the case, and the homeowner appealed. Reversing and remanding, the Seventh Circuit held that the inquiry into whether a communication was subject to the FDCPA was context-sensitive, that "the absence of a demand for payment is just one of several factors that come into play in the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any debt." *Id.* at 385. The court held that letters asking a homeowner to apply for a loan modification are an "offer to discuss [a consumer's] repayment options" and thus are communications under the FDCPA. *Id. at* 386. That is, such letters are "opening communication in an attempt to collect [a consumer's] defaulted home loan." *Id.*

Similarly, in *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364 (3d Cir. 2011), a consumer filed suit against a foreclosure law firm, which was subject to the FDCPA, for two

letters it sent to her attorney. In one of the letters, the law firm itemized the amount of attorney fees incurred, but made no demand for payment. *Id.* at 369, fn. 5. The law firm filed a motion to dismiss, which the trial court granted. Reversing and remanding, the Third Circuit rejected the law firm's argument that because there was no demand for payment, the letter was not a communication for purposes of the FDCPA. The court thus held that "[a] communication, however, is 'the conveying of information regarding a debt' and is not limited to specific requests for payment." *Id.*

In this case, regardless of whether all or just some of Saxon's letters were sent in connection with collection of the mortgage debt, Saxon sent a total of 16 letters to Stagikas after being informed that he was represented by counsel, including mortgage statements and delinquency notices, stating "Saxon Mortgage Services is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose." (Pl's Resp. to Def's SMF ¶ 21, Stagikas Aff. Exs. 7–8.) Although Saxon claims that only the May 24, 2010 letter is at issue, Saxon fails to recognize that at Stagikas's deposition Saxon's counsel did not ask him to identify or authenticate any of these additional letters. (Pl's SMF ¶ 27, Stagikas Aff. ¶ 22.) Many of these demanded payment and stated that they were sent in connection with collection of the debt, and thereby violated the FDCPA. Even the letters that did not explicitly demand payment, such as the August 26, 2010 letter, cautioned Stagikas that "This is an attempt to collect a debt . . . ." Other letters encouraged Stagikas to contact Saxon about alternate ways to work out the issues with his mortgage, which would naturally contemplate payment to Saxon. That is, they were "opening communication[s] in an attempt to collect [a consumer's] defaulted home loan," *Gburek*, 614 F.3d at 380, and conveyed information Stagikas about his debt. *Allen* 620 F.3d at 369. Saxon thus violated the FDPCA with its communications to Stagikas.

### 3) Saxon violated the FDCPA, 15 U.S.C. § 1692c, by contacting Stagikas when it knew he had an attorney.

To establish a violation of § 1692c(a)(2), the plaintiff must show: (1) that he was represented by an attorney with regard to that debt; and (2) that the debt collector had actual knowledge of representation regarding that debt prior to the sending of the collection letter. *Goodman v. S. Credit Recovery, Inc.,* 1999 WL 14004 (E.D. La. Jan. 8, 1999). Here, Stagikas informed Saxon that he was represented by an attorney in his request on May 17, 2010 for the NPV data. (Pl's SMF ¶ 23, Stagikas Aff. Ex. 4.) The document Stagikas sent was titled "AUTHORIZATION AND CEASE-AND-DESIST ORDER" and stated "Borrower hereby informs you that Borrower is represented by Attorney Josef Culik of Culik Law PC with regard to the above account(s)." *Id.* There was no doubt that Stagikas was represented by counsel.

Saxon seizes upon one sentence of the authorization, which emphasized that "Borrower hereby demands that you CEASE AND DESIST all telephone contact with Borrower." *Id.* Saxon argues that this request to cease telephone contact was a carve-out for non-telephone communication. This argument is misplaced. Stagikas did not affirmatively permit Saxon to communicate him; rather, he informed Saxon that he was represented by counsel. Indeed, the letter did not limit the representation, or state that Saxon was allowed to contact Stagikas for any reason. Under the FDCPA, once Saxon knew Stagikas was represented, it had an obligation to cease communications, including written communications. Thus, the facts on record meet the elements of 15 U.S.C. § 1692c(a)(2) violation set forth in *Goodman*, 1999 WL 14004, and show that Saxon violated the FDCPA. Its motion for summary judgment should be denied related to this violation.

**4) Saxon's actions were unfair and deceptive in violation of the FDCPA, 15 U.S.C. § 1692f.**

The FDCPA states that "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The criteria for determining unfairness under 15 U.S.C. § 1692f is the same as for unfairness under ch. 93A. *See F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 fn. 5 (1972) (standard for unfairness is whether the act is (1) "within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers"). The analysis stated above in Section IV.B is hereby incorporated by reference, and the same conclusion should be reached, i.e., that Saxon's actions are within the penumbra of established policy, are unethical and unscrupulous, and caused Stagikas substantial injury, thereby violating the FDCPA's prohibition on unfairness. Accordingly, Saxon's motion should be dismissed on those grounds.

**D.   Stagikas suffered damages related to the breach of contract, Chapter 93A violation, and FDCPA violations.**

**1) Breach of contact damages: Stagikas's account was assessed tens of thousands of dollars extra because Saxon assessed the original unmodified payment amount, rather than the modification payment amount.**

It is a long established principle of Massachusetts law that "[f]or every breach of a promise made on good consideration, the law awards some damage." *Hagan v. Riley*, 13 Gray 515, 516 (Mass. 1859). *See also Clark v. Gulesian*, 197 Mass. 492, 494 (1908); *Singarella v. City of Boston*, 342 Mass. 385, 386-387 (1961). The objected in measuring damages in the event of a breach "is to place the injured party in as good a position as he would have been in had the contract been performed." *American Mechanical Corp. v. Union Mach. Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 101, 485 N.E.2d 680, 683 (1985).

24

Here, Stagikas's original monthly mortgage payment was approximately $2,515. His TPP payment, and his permanent modification payment (had Saxon provided it), would have been $1,123.75. Stagikas's permanent modification should have started in January 2010, and Stagikas's account would have been assessed with only the lower of the two amounts every month. Instead, Saxon has failed to provide the permanent modification, and has assessed Stagikas's account with the original payment amount every month. As a result, Stagikas owes a significant amount more on his mortgage than he would have if Saxon provided the modification.

$$
\begin{array}{rl}
\$ \ 2{,}514.82 & \text{(regular monthly payment)} \\
- \ \ \$ \ 1{,}123.75 & \text{(modified monthly payment under the TPP)} \\
\hline
\$ \ 1{,}391.07 & \text{(additional amount Saxon assessed each month)} \\
\times \ \ \ \ \ \ \ \ \ \ 41 & \text{(number of months since TPP ended)} \\
\hline
\$ \ 57{,}033.87 & \text{(actual damage to Stagikas)}
\end{array}
$$

Stagikas's mortgage account has thus been assessed an additional $57,033.87 because of Saxon's breach of contract.

### 2)  Chapter 93A damages: Stagikas also suffered the invasion of his legally protected interest in the TPP.

A plaintiff must suffer an injury in order to be entitled to relief under ch. 93A. Mass. Gen. Laws ch. 93A, § 9. The Supreme Judicial Court interprets the term "injury" to be an "invasion of a legally protected interest of another." *See Haddad v. Gonzalez*, 410 Mass. 855, 864–65, 576 N.E.2d 658, 664 (1991); *Leardi v. Brown*, 394 Mass. 151, 158–59, 474 N.E.2d 1094, 1101 (1985) (damages recoverable without economic loss where unlawful contract term included in lease). As such, damages may be recoverable under ch. 93A, § 9 even though the claimant has not actually sustained an economic loss. *Id.* In such a case, a plaintiff would be entitled to a minimum of $25 in statutory damages, plus costs and attorney fees. *Id.*; Mass. Gen. Laws ch. 93A, §§ 3–4.

Thus, even if Stagikas suffered no economic loss, Saxon nevertheless invaded Stagikas's interest in the TPP, and he is entitled to $25 in statutory damages plus his costs and attorney fees. As shown in the above section, however, Stagikas suffered over $57,000 in economic damages as a result of Saxon's breach of contract, which will also be compensable as actual damages under Chapter 93A. This amount may be doubled or trebled in the event of a judgment in his favor at the trial of this matter. *Id.*

3) **FDCPA damages: Stagikas is also entitled to damages under the FDPCA, including emotional-distress damages.**

Stagikas will be entitled to a minimum of up to $1,000 in statutory damages, costs, and attorney fees, under the FDCPA. 15 U.S.C. § 1692k. He will also be entitled to his actual damages. 15 U.S.C. § 1692k(a)(1). Actual damages under federal law include emotional distress. *Carey v. Piphus*, 435 U.S. 247, 267, n. 20 (1978) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). An award of actual damages for a violation of the FDCPA may include damages for emotional distress caused by the debt collector's statutory violation. *See McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, No. 09-10159-MBB, 2012 WL 5878665 (D. Mass. Nov. 20, 2012). The FDCPA allows for recovery of emotional-distress damages without having to prove the elements of a state-law tort claim for intentional infliction of emotional distress. *See In re Maxwell*, 281 B.R. 101, 118 (Bankr. D. Mass. 2002) (state law requirements that must be proven to establish negligent or intentional infliction of emotional distress held to be inapplicable to the FDCPA); *Smith v. Law offices of Mitchell N. Kay*, 124 B.R. 182, 186 (D. Del. 1991) ("plaintiff does not have to prove the state law tort elements of intentional infliction of emotional distress in order to collect damages for mental suffering").

Here, in addition to the actual damages from Saxon's unfair and deceptive breach of contract, Stagikas will also be entitled to his emotional-distress damages. These damages are that

he lost weight, which affected his performance in his career as a professional wrestler; he felt a racing heart, restlessness, and muscle tension; and he developed shingles that he attributes to the stress of dealing with the constant threat of losing his home. (Pl's SMF ¶ 28, Stagikas Aff., ¶¶ 23–24.) Stagikas's own testimony as to the effect of Saxon's actions on him is sufficient. *See In re Hart*, 246 B.R. 709 (Bankr. D. Mass. 2000) (holding that consumer's testimony about anger and frustration sufficient to award damages, even though testimony did not meet requirements for state-law claim for emotional distress). Stagikas will thus be able to show damages under the FDCPA.

### V. Conclusion

For the foregoing reasons, Stagikas has shown that Saxon breached the TPP, committed unfair and deceptive business practices in violation of ch. 93A, and violated the FDCPA. Saxon's motion for summary judgment should be denied.

Respectfully submitted,

*/s/ Josef C. Culik*
Josef C. Culik (BBO #672665)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
Tel. (617) 830-1795
Fax  (617) 830-1576
jculik@culiklaw.com

Attorney for Plaintiff John Stagikas

May 15, 2013

27